IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

FRANCIS DELBERT FORD III,

                Petitioner,

     v.

JEAN HILL,

                Respondent.

Civil No. 07-509-AC

FINDINGS AND RECOMMENDATION

DANIEL J. CASEY
PO Box 82818
Portland, OR  97282

        Attorney for Petitioner

JOHN R. KROGER
Attorney General
SUMMER R. GLEASON
Senior Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR  97301

        Attorneys for Respondent

1 - FINDINGS AND RECOMMENDATION -

ACOSTA, Magistrate Judge.

Petitioner brings this habeas corpus action pursuant to 28 U.S.C. § 2254.  For the reasons that follow, the Amended Petition for Writ of Habeas Corpus should be DENIED.

## **BACKGROUND**

On April 24, 2001, a Marion County grand jury indicted Petitioner on two counts of Sodomy in the First Degree, two counts of Unlawful Sexual Penetration in the Second Degree, and two counts of Sexual Abuse in the First Degree.  The charges arose when Petitioner's 19-year old stepdaughter, upon questioning by her mother (Petitioner's wife), disclosed that Petitioner had sexually abused her for several years.  The indictment alleged that two acts of sexual abuse and two acts of sexual penetration occurred in Oregon between April 1, 1995, and March 23, 1996, and that two acts of sodomy occurred between April 1, 1995, and December 31, 1996.

The case was tried to a jury.  At trial, the victim testified that beginning in 1992, when the family lived in Roy, Washington, Petitioner touched her vagina "every other weekend while [her] mom was away at drill weekend" for the Naval Reserves.  The abuse continued when the family moved to Salem, Oregon, in 1994.

After the move to Salem, the victim testified Petitioner abused her every other night, or three or four times each week.  She said Petitioner would come into her room after everyone else was asleep and touch her vagina with his fingers.  The victim testified that her mother was sometimes home, and sometimes not, when the abuse occurred.

The victim also testified that on two occasions in the fall of 1996, Petitioner licked her vagina.  She said the first time happened on a weekend, after the family had come back from spending a day at Detroit Lake, which they often did.  The second time was a couple of weeks later.

2 - FINDINGS AND RECOMMENDATION -

According to the victim, Petitioner had been drinking every time he abused her. Each time, she could smell alcohol on his breath and had seen him drinking earlier in the day. The victim said the abuse stopped by April of 1997.

The victim testified she did not tell anyone about the abuse for several years because she did not think they would listen. She said the first person she told was her best friend, in the spring of 1999. Word eventually got back to her mother in January or February of 2001, and in April of 2001, the victim's mother took her to the Salem police to make a report.

Several days after the initial report, at the instigation of police, the victim made a "pretext" telephone call to Petitioner. The call was recorded. The victim told Petitioner she wanted to see him to "hear something from him, some contrition, some admission from him," but that she would not report it. Petitioner responded that he would have to think about it.

Shortly after the pretext call, two Salem police detectives arrested Petitioner at his home in Gresham. According to the lead detective, he asked Petitioner during the drive back to Salem whether Petitioner ever had sexual contact with the victim. Petitioner said it was "hard to say" because he had been drinking heavily in 1994 and 1995. Petitioner told the detective he had a poor memory, was prone to alcoholic blackouts, and was so drunk he never knew what he was doing. The lead detective further testified that when asked whether he was so drunk it was possible he had sexual contact with the victim, Petitioner did not answer immediately, and then said he was not capable of knowing what he had done during that time frame.

Petitioner testified at trial. He denied ever touching the victim inappropriately. He also denied ever going into her bedroom at night when she was sleeping. According to Petitioner, the closest he ever got was to stop by her doorway to say "good night." Petitioner explained that the

pretext call from the victim surprised him because she never telephoned him, and that he was suspicious and thought the call was tapped.  He said that he told her he would think about her request just to get off the phone.

With respect to the detective's testimony, Petitioner denied ever claiming he did not recall, or being unable to recall having sexual contact with the victim, and denied ever having blackouts or telling the detectives he had them.  Petitioner admitted having an alcohol problem and that he stopped drinking in 1998 or 1999, and admitted previously abusing controlled substances, but denied that either ever caused him to have blackouts.

The defense also presented evidence that the victim's bedroom in Salem did not have a door, only a curtain.  The house was described as old, small, and with creaking floors and cramped with furniture, making it difficult to move about at night without tripping over things.  At the time of the abuse, the family had three dogs, one of which followed Petitioner everywhere throughout the house.

The jury found Petitioner guilty on all counts except for one count of first-degree sodomy. The trial judge sentenced Petitioner to a 100-month sentence on the sodomy conviction, and 75 months each on the two unlawful penetration and two sexual abuse convictions.  All were Measure 11 mandatory minimums the trial judge imposed consecutively, for a total sentence of 400 months of imprisonment.

Petitioner filed a direct appeal.  The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review.  *State v. Ford*, 188 Or. App. 317, 72 P.3d 126, *rev. denied*, 336 Or. 16, 77 P.3d 319 (2003).

4 - FINDINGS AND RECOMMENDATION -

Petitioner then sought state post-conviction relief ("PCR"). Following an evidentiary hearing, the PCR trial judge denied relief. Petitioner appealed. The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. *Ford v. Hill*, 208 Or. App. 757, 145 P.3d 1145 (2006), *rev. denied*, 342 Or. 256, 151 P.3d 930 (2007).

On April 9, 2007, Petitioner filed his habeas corpus action in this court. In his Amended Petition for Writ of Habeas Corpus, he alleges two claims for relief:

> **Ground One:** Petitioner was denied his right to effective assistance of counsel under the Sixth and Fourteenth Amendments, because petitioner was not competent to stand trial, and having reason to suspect that, his trial lawyer failed [to] obtain a psychological evaluation or inform the trial court of petitioner's diminished mental capacity, and instead allowed petitioner to stand trial and proceed to sentencing while mentally incompetent.

> **Ground Two:** Petitioner was denied his right to effective assistance of counsel under the Sixth and Fourteenth Amendments, because his trial lawyer failed to present evidence that would have contradicted the complainant's version of events, impeached her credibility, and demonstrated that the sexual abuse she alleged could not have happened.

Respondent contends Petitioner procedurally defaulted both claims for relief and that, in any event, the PCR court's decision denying relief is entitled to deference.

## DISCUSSION

### I.    Procedural Default

Generally, a state prisoner must exhaust all available state court remedies either on direct appeal or through collateral proceedings before a federal court may consider granting habeas corpus relief. 28 U.S.C. § 2254(b)(1); *Cook v. Schriro*, 538 F.3d 1000, 1025 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 1033 (2009). A state prisoner satisfies the exhaustion requirement by fairly presenting his claim to the appropriate state courts at all appellate stages afforded under state law.

*Cook*, 538 F.3d at 1025; *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  To "fairly present" a federal constitutional claim to the state court, a petitioner must make the federal basis of the claim explicit either by citing to federal law or to the decisions of federal courts.  *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999).  The exhaustion requirement is not satisfied, however, "where the claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor."  *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

When a state prisoner fails to exhaust his federal claims in state court and the state court would now find the claims barred under the applicable state rules, the federal claims are procedurally defaulted.  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).  Habeas review of procedurally defaulted claims is barred unless the petitioner demonstrates cause for the procedural default and actual prejudice, or that the failure to consider the claims will result in a miscarriage of justice.  *Coleman*, 501 U.S. at 750; *Cook*, 538 F.3d at 1028.

Respondent argues Petitioner procedurally defaulted both grounds for relief because he did not present his claims to the Oregon appellate courts in a procedural context in which they could have been considered.[1]  According to Respondent, Petitioner did not argue on appeal that the PCR trial court's factual findings were not supported by any evidence or that the legal conclusions were in error, but instead essentially repeated the arguments made in the PCR trial court.  As such, Respondent concludes, Petitioner did not identify any reversible error and Petitioner's claims

---

[1]Respondent initially argued Petitioner failed to present the claims as a federal question to the Oregon Supreme Court, a position not well-taken in light of the direct reference to the violation of Petitioner's federal constitutional right of assistance of counsel contained in the Petition for Review.  *See* Resp. Exh. 143.

should be denied on the basis that they were raised in a procedural context in which the merits of

the claim would not be considered.  Respondent is incorrect.

In his brief to the Oregon Court of Appeals, Petitioner identified one of his questions

presented as:  "[w]as the assistance of counsel petitioner received in the underlying criminal case

constitutionally adequate?"[2]  He went on to summarize his argument as follows:

> Petitioner was not given adequate assistance of trial counsel in the
> underlying criminal case, leading to his convictions for multiple counts.  Counsel
> did not ask for a mental status evaluation of petitioner before trial.  Had he done so,
> it would have been discovered that petitioner suffered from bipolar disorder and
> was also so medicated and sedated that he could not comprehend the trial as it took
> place.  Petitioner proved this through the affidavit/letter of Dr. Jerry Larsen, who
> documented the medications dispensed to petitioner by the Marion County Jail
> during his trial.  Petitioner would have been so sedated that he could not aid and
> assist in his defense.  Additionally, counsel was ineffective for failing to establish
> that the account of events rendered by the alleged victim could not have occurred
> as she testified.  The level of representation by the attorney was defective under the
> Sixth Amendment to the US Constitution, and his convictions should be vacated.

Resp. Exh. 140, pp. 2-3.  The state filed a respondent's brief on the merits of Petitioner's

assignment of error, in which the state conceded "Petitioner generally preserved this claim of

error."  Resp. Exh.  142, p. 10.

As noted above, the Oregon Court of Appeals affirmed without opinion.  As such, it is not

apparent on the record that the Court rejected Petitioner's appeal on a procedural ground, rather

than on the merits.[3]  Accordingly, Petitioner did not procedurally default his claims.  *See Coleman*,

---

[2]The other question presented challenged the PCR trial court's decision denying
Petitioner's request for a continuance at the time of the evidentiary hearing.

[3]Respondent's citation to *Burnham v. Blacketter*, (D. Or. 05-850-JE, D. Or., April 8, 2008)
is unpersuasive.  In fact, although Judge King initially adopted Judge Jelderks's finding that
a petitioner procedurally defaulted a claim by not objecting to the Oregon PCR trial court's
dispositive factual findings, on April 28, 2009, Judge King issued an Opinion and Order

501 U.S. at 734-35; *see also Harris v. Reed*, 489 U.S. 255, 261-62 (1989) (mere fact that a federal claimant failed to abide by a state procedural rule does not, in and of itself, prevent a court from reaching the federal claim; rather, a "plain statement" that state decision rests on state procedural grounds is necessary before federal habeas corpus review is precluded).

## II.    Relief on the Merits

### A.    Legal Standards

Under 28 U.S.C. § 2254 (d) (1), habeas corpus relief may not be granted on any claim that was adjudicated on the merits in state court, unless the adjudication:

> (l) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is not considered "contrary to" established Supreme Court precedent unless it "applies a rule that contradicts the governing law set forth in [Supreme Court cases]" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003). A federal habeas court cannot overturn a state decision "simply because that court concludes in its independent judgment that the relevant state-court decision

---

reversing that decision. Moreover, to the extent Judge Mosman recently found procedural default under somewhat similar circumstances in *McShane v. Howton*, (D. Or. 08-1443-MO, May 17, 2010), that case is distinguishable. There, in the PCR appeal the state filed a motion for summary affirmance; the state did not address the claims on the merits as was done here in the Respondent's brief, and it was apparent from the record that the summary dismissal was not a decision on the merits of the petitioner's federal claims.

applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 409 (2000).

An "unreasonable application" of clearly established Supreme Court law occurs when "the state court identifies the correct governing legal principle ... but unreasonably applies that principle to the facts of the ... case." *Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004) (citing Williams, 529 U.S. at 413). "'Clearly established Federal law' is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lambert*, 393 F.3d at 974.

The Supreme Court has established a two-part test to determine whether a defendant has received ineffective assistance of counsel. Under this test, a petitioner must prove that counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-888 (1987).

To prove a deficient performance of counsel, a petitioner must demonstrate that trial counsel "made errors that a reasonably competent attorney as a diligent and conscientious advocate would not have made." *Butcher v. Marquez*, 758 F.2d 373, 376 (9th Cir. 1985). The test is whether the assistance was reasonably effective under the circumstances, and judicial scrutiny must be highly deferential, with the court indulging a presumption that the attorney's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

To establish the second prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In determining whether a defendant was

prejudiced by ineffective assistance of counsel, the court should examine whether the "'result of the proceeding was fundamentally unfair or unreliable.'" *United States v. Palomba*, 31 F.3d 1456, 1460-61 (9th Cir. 1994) (*quoting Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993)).

**B. Analysis**

### 1. Ground One - Allowing Petitioner to Stand Trial Without Psychological Evaluation

Petitioner contends counsel provided constitutionally ineffective assistance of counsel by allowing Petitioner to stand trial without obtaining a psychological evaluation or informing the trial court of Petitioner's diminished mental state. Petitioner has been diagnosed since 1986 as bi-polar, with severe depression and anxiety. He previously had been committed three times. While in jail before and during trial, and at sentencing, Petitioner was given a variety of psychotropic medications.

In his PCR case, Petitioner testified that, as a result of his bipolar condition, his depression, and the medication he was given, he could not concentrate at trial, remember things, or register what was being said. Petitioner also said he was not able to prepare for his case because he did not know what to prepare for. Petitioner further testified that he told his trial attorney about all the medication he had received in jail, that something was not right with them, that he did not feel right, and that he wanted to go to the Oregon State Hospital to be checked out. According to Petitioner, his trial attorney simply responded "good luck," and he did not offer to send Petitioner to the Oregon State Hospital.

Petitioner also presented evidence from his brother and sister who stated Petitioner seemed very drugged up, unfocused, and as if he were someplace during the criminal trial. He had not shaved, cut his hair, or cleaned himself up.

Dr. Jerry Larsen, a psychiatrist engaged by Petitioner for the purposes of the PCR case, examined Petitioner four years after the trial, spoke to Petitioner's relatives, and reviewed the list of anti-psychotic and antidepressant medications administered to Petitioner while he was in jail before and during the criminal trial. Dr. Larsen concluded "in my medical psychiatric opinion [Petitioner] *may not* have at time of this trial possessed the requisite ability to adequately aid and assist in his own defense." Resp. Exh. 129, p. 7 (emphasis added).

Finally, Petitioner noted his trial attorney's statement at sentencing, where he stated:

We can look at a lot of mitigating factors, but one of them is the diminished mental capacity. We don't have a psychological report. There's reasons for that, but we don't have one. But I don't think it takes too much to determine that the mental capacity of this individual, after viewing him and his testimony, his appearance and demeanor, suggests that he has problems and mental disorders. They are not going to be fixed I prison, not going to be cured.

Resp. Exh. 105, p. 13. In a memo justifying the number of hours he spent on Petitioner's case, trial counsel described "preparing for a difficult sentencing hearing for a client who was largely unpresentable in court."

By contrast, the state offered evidence from Petitioner's trial attorney contradicting Petitioner's position. Trial counsel and his investigator met with Petitioner numerous times prior to trial. As trial counsel stated:

Both my investigator and myself had no doubt that petitioner could – and did -- aid and assist in his own defense. He was at all times clear as to the charges against him. His explanations for his behavior in response to the charges and in his defense

> were sensible, detailed, logical and credible. I never questioned his competency at
> any time during the proceeding.

Resp. Exh. 137, p. 2.

The investigator also found Petitioner to be "clear headed in all my meetings with him."

*Id*., Attachment A.  The investigator went on to detail his contacts with Petitioner:

> He asked pointed questions about the case. He helped me construct a timeline of his
> wife's employment record, times that she was in the home and times that she would
> be out of town, all for alibi purposes. He informed me of his daily routine in the
> household and that of the children. [Petitioner] stated clearly to me the reasons why
> the 'victim' wanted to have him out of the way.

Id.

Moreover, the state argued, neither trial counsel, who had ample opportunity to observe

Petitioner, nor the criminal trial judge gave any indication on the record that Petitioner appeared

incompetent.  Indeed, during Petitioner's testimony on cross-examination the trial judge recognized

Petitioner's attempt to avoid answering a difficult question by arguing with the prosecutor and

admonished Petitioner.

The PCR trial judge considered all of this evidence and noted the problematic nature of this

issue, but ultimately rejected Petitioner's claim.  As the judge explained:

> The question of [Petitioner's] mental condition and whether or not he should
> have been submitted for a medical exam or psychiatric exam or psychological exam
> to determine his ability to aid and assist in his own defense, or if he – whether he
> had a mental defect which would've – which would've (INAUDIBLE) him in any
> way, shape or form is – is a different question and it's a problematical question.
>
> Dr. Larsen writes an extensive affidavit, report, and says that it may have
> been a problem for him, quite frankly.  He outlines the drugs that the defendant or
> the petitioner was taking at the time that he was incarcerated in jail.  And he relies
> in great part upon the family of the petitioner who testified that he was in a stupor
> and didn't know what was going on and confused and – and then the petitioner
> himself comes forth very strongly and testifies I didn't have the slightest idea what
> was going on.  I don't remember any of it and I don't have any recollection of this

12 - FINDINGS AND RECOMMENDATION -

or that.  And yet the interesting part of it is he has great recall in what voids were occurred insofar as his inadequacy of counsel is concerned.  I realize some of this can come from relating to it insofar as the paperwork is concerned, but I think a great deal of it comes to – to his own memory of sitting through the trial.

* * *

In this case the fact that he had some mental defects does not mean that he was not capable of aiding and defending in his own case.  He appeared to be fully cognizant of what was going on during his testimony.  He testified at great length insofar as what occurred, what didn't occur, how this couldn't have happened, how he couldn't have been involved, how everybody was lying, how he was telling the truth.  I find that to be totally inconsistent with the position that he's stating to Dr. Larsen in which he didn't just have the slightest idea of what was going on, nor was he able to help himself in order to clarify anything.

I find the evidence is pretty clear that Dr. Larsen's, at least prognosis or diagnosis is weak because of his total reliance or substantial reliance upon the family's statements as well as the petitioner's statements.  I think the defendant, or petitioner knew exactly what was going on in pretrial.  He was capable in aiding in his own defense.  I think he [has] some mental deficiencies.  I think a lot of people out there have mental deficiencies, but those people, too, are responsible for their actions and they're able to aid in their own defense.

Resp. Exh. 138, pp. 26-28.

The PCR court's decision was not contrary to or an unreasonable application of clearly established federal law.  All criminals have the right to be competent when they stand trial.  The standard for determining whether a criminal defendant is competent to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402, (1962); *see also Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (reaffirming *Dusky* standard).

In *Medina v. California*, 505 U.S. 437 (1992), the Supreme Court established that a state may presume that a defendant is competent and require the defendant to prove his incompetence

by a preponderance of the evidence.  Due process requires the state to provide access to procedures adequate to protect the defendant's right not to be tried or convicted while incompetent.  *Id.* at 452 (citing *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975)).

Under Oregon law, a defendant is able to aid and assist in his own defense if he is able to (1) understand the nature of the proceedings against him; or (2) assist and cooperate with his lawyer; or (3) participate in his own defense. Or. Rev. Stat. § 161.360(2).  A defendant is competent to stand trial if he is able to "understand the nature of the proceedings against him." *State v. Peterson*, 70 Or. App. 333, 344, 689 P.2d 985 (1984).

In light of all the evidence before him, the PCR trial judge reasonably concluded Petitioner was able to understand the nature of the proceedings, did in fact assist and cooperate with his lawyer, and did in fact participate in his own defense.  Accordingly, the PCR court's finding that counsel did not provide ineffective assistance of counsel by failing to have Petitioner evaluated is not contrary to or an unreasonable application of *Strickland*, and Petitioner is not entitled to relief on this claim.

### B.    Ground Two - Failure to Impeach

Finally, Petitioner alleges trial counsel provided constitutionally ineffective assistance when he failed to present evidence that would have contradicted the victim's version of events, impeached her credibility, and demonstrated that the sexual abuse she alleged could not have happened.  On appeal from the PCR denial, Petitioner described the factual support for this claim as follows:

> Counsel failed to establish that the alleged victim was not telling the truth about the number of incidents of abuse.  She testified that these events happened every other weekend from 1992 until 1994 or thereabouts.  Petitioner proved that was not

possible.  According to the victim (petitioner's stepdaughter), the abuse happened when her mother was away from home in the Naval Reserve.  But she was only gone one weekend a month for her naval duty.  Thus, the abuse couldn't have happened every other weekend.  Moreover, the mother retired from the Naval Reserve in 1993, and would not have been gone any weekend after that point.

Resp. Exh. 140, p. 12.  Petitioner claimed that trial counsel should have called petitioner's wife to

testify, and that she would have testified that she was around the house quite a bit

The post-conviction court rejected Petitioner's claim:

I find that counsel did investigate the case.  I find that he did, in fact, use his investigator to contact potential witnesses to determine what's available, what isn't available to him insofar as his defense of the petitioner. . . .

Insofar as cross examination of the victim was concerned, it was an extensive cross examination by counsel.  He went into all aspects and attempted to discover what breaks in the record he could find; what favorable evidence he could find as a result.  And went about it as – in a reasonable and attorney-like manner.

* * *

Ann Prester [Petitioner's wife] could not have added anything insofar as – as credibility is concerned to the defendant's position.  She obviously was not there at the time of all these alleged acts.  And the fact that he harps about the Detroit situation because of the time of year, nothing occurred at Detroit, it occurred after they had gotten back from the Detroit trip.  And the scope of time during which these acts occurred was an extensive scope.  And there were many, many, many opportunities which Mrs. Prester wouldn't have the slightest idea of what went on.  And many, many, many opportunities for the petitioner to practice whatever he wanted to insofar as the child was concerned.  One weekend, two, weekends, six weekends a week – or month, wouldn't have made a damn bit of difference insofar as specific allegations over the time periods that were included in.

I find nothing from the issues that I've discussed that would any way, shape or form have any effect upon the outcome of this case.

Resp. Exh. 138, pp. 23-26.

The PCR court's decision was not contrary to or an unreasonable application of *Strickland*.

Other than his own, self-serving, testimony, Petitioner did not present evidence that Ann Prester

15 - FINDINGS AND RECOMMENDATION -

would have actually testified or, if so, that her testimony would have changed the outcome of the case. Moreover, on cross-examination, trial counsel questioned the victim at some length about her mother's work history, and the victim testified consistently with the evidence of work history presented at the PCR trial.

The victim agreed her mother was around most of the time the abuse was happening in Salem. The mother's work history focused upon by the Petitioner in the PCR proceeding related to the period of time involving the uncharged offenses in Washington State. In light of the victim's testimony about the charged offenses, the PCR court reasonably concluded counsel was not ineffective for choosing not to focus on impeaching the victim as to the uncharged offenses. Accordingly, Petitioner is not entitled to habeas corpus relief on the claim alleged in ground two.

## RECOMMENDATION

For these reasons, I recommend that the Amended Petition for Writ of Habeas Corpus be DENIED and that a judgment of DISMISSAL be entered. Should Petitioner appeal, a certificate of appealability should be DENIED as Petitioner has not made a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c)(2).

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due July 13, 2010. If no objections are filed, review of the Findings and Recommendation will go under advisement that date.

A party may respond to another party's objections within 14 days after service of a copy of the objections.  If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or on the latest date for filing a response.

DATED this <u>29th</u> day of June, 2010.


<u>/s/ John V. Acosta</u>
John V. Acosta
United States Magistrate Judge